963 A.2d 234

**Harriette JULIAN**

v.

**Joseph BUONASSISSI, et al.**

**No. 2740, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Jan. 5, 2009.

Phillip Robinson (Civil Justice, Inc., on the brief), Baltimore and (Stephen D. Ball, on the brief), Mitchellville, for appellant.

Bizhan Beiramee (Rathbun & Goldberg, PC, on the brief), Fairfax, VA and (Joseph V. Buonassissi, II, Richard E. Henning, Jr., Richard A. Lash, Keith M. Yacko and Brian S. McNair as Substitute Trustees and U.S. Bank, N.A., as Trustee for Citigroup Mortgage Loan Trust Inc., on the brief), for appellee.

Panel: JAMES R. EYLER, MEREDITH and J. FREDERICK SHARER (Ret., specially assigned), JJ.

JAMES R. EYLER, J.

This is a foreclosure action instituted by the substitute trustees under a deed of trust and the holder of a promissory note secured by the deed of trust, collectively appellees,[1] in the Circuit Court for Charles County, against LaShawn Wil-

---

1. The substitute trustees are Joseph V. Buonassissi, II, Richard E. Henning, Jr., Richard A. Lash, Keith M. Yacko, and Brian S. McNair. The note holder is U.S. Bank, N.A., as trustee for Citigroup Mortgage Loan Trust, Inc. 2007–WFHE2, a mortgage backed security ("U.S. Bank").

son, the record owner of property known as 10382 Cassidy Court ("the property"). Harriette Julian, appellant, claiming an interest in the property as a prior owner, intervened and filed exceptions to the foreclosure sale. The court overruled the exceptions and ratified the sale. Appellant noted this appeal.

In the circuit court and on appeal, appellant contends that she was a victim of a "mortgage foreclosure scam" and that she is entitled to relief under the Protection of Homeowners in Foreclosure Act (PHIFA),[2] Maryland Code (2003 Repl. Vol., Supp. 2006), § 7-301, *et. seq.* of the Real Property Article (RP). As explained below, we shall affirm the judgment.

## PHIFA

In *Johnson v. Wheeler*, 492 F.Supp.2d 492 (D.Md.2007), the court described the operation of "mortgage rescue scams."

Typically, a homeowner facing foreclosure is identified by a rescuer through foreclosure notices published in the newspapers or at government offices. The rescuer contacts the homeowner by phone, personal visit, card or flyer, and offers to stop the foreclosure by promising a fresh start through a variety of devices. As the date for the foreclosure approaches and the urgency of the matter becomes greater, the rescuer or some entity with which he is linked agrees to arrange for the pay-off of the mortgage indebtedness and to see to the transfer of title to the property to an investor pre-arranged by the rescuer, often with a leaseback of the property to the homeowner for a period of time, occasionally giving him the right to repurchase the property after the lease ends. The rescuer imposes heavy fees or other charges for his services, in effect stripping some if not all of the homeowner's equity, and does all this with little or

---

2. On April 3, 2008, PHIFA was repealed and reenacted with substantive changes. *See* Laws of 2008, ch. 6, § 1 (effective April 3, 2008). The parties agree that the new law does not apply to this case, and it is governed by the law as it existed under the Laws of 2005, ch. 5, § 1, effective May 26, 2005.

no advance notice to the homeowner, who is usually unrepresented by counsel. *See generally* STEVE TRIPOLI & ELIZABETH RENUART, NATIONAL CONSUMER LAW CENTER, DREAMS FORECLOSED; THE RAMPANT THEFT OF AMERICANS' HOMES THROUGH EQUITY–STRIPPING FORECLOSURE 'RESCUE' SCAMS (2005).

492 F.Supp.2d at 495–96.

As explained in the Preamble to the Bill that was enacted as PHIFA,

> In response to foreclosure abuses, in 2005, the legislature enacted PHIFA. As stated in the preamble to Senate Bill 761, in pertinent part, the legislation was for the purpose of specifying the form and contents of certain contracts and documents; providing that a homeowner has the right to rescind certain contracts and transactions within a certain time; ... prohibiting foreclosure consultants and foreclosure purchasers from engaging in certain practices; ... prohibiting certain documents from being recorded within a certain period; ... and exempting certain persons from certain provisions of this Act....

Preamble, Laws of 2005, ch. 509.

In pertinent part, the statute provides as follows. A foreclosure consultant [3] must provide a foreclosure consulting con-

---

**3.** "Foreclosure consultant" means a person who:

> (1) Solicits or contacts a homeowner in writing, in person, or through any electronic or telecommunications medium and directly or indirectly makes a representation or offer to perform any service that the person represents will:
>
> (i) Stop, enjoin, delay, void, set aside, annul, stay, or postpone a foreclosure sale;
>
> (ii) Obtain forbearance from any servicer, beneficiary or mortgagee;
>
> (iii) Assist the homeowner to exercise a right of reinstatement provided in the loan documents or to refinance a loan that is in foreclosure and for which notice of foreclosure proceedings has been published;
>
> (iv) Obtain an extension of the period within which the homeowner may reinstate the homeowner's obligation or extend the deadline to object to a ratification;

tract[4] to the homeowner[5] for review which must disclose the services to be provided and the compensation to be received by the consultant or others working with the consultant, and advise the homeowner of rescission rights granted by the statute. RP § 7-306. A homeowner has the right to rescind a foreclosure consulting contract at any time and rescind a foreclosure reconveyance[6] at any time within 3 business days

---

(v) Obtain a waiver of an acceleration clause contained in any promissory note or contract secured by a mortgage on a residence in foreclosure or contained in the mortgage;

(vi) Assist the homeowner to obtain a loan or advance of funds;

(vii) Avoid or ameliorate the impairment of the homeowner's credit resulting from the filing of an order to docket or a petition to foreclose or the conduct of a foreclosure sale;

(viii) Save the homeowner's residence from foreclosure;

(ix) Purchase or obtain an option to purchase the homeowner's residence within 20 days of an advertised or docketed foreclosure sale;

(x) Arrange for the homeowner to become a lessee or renter entitled to continue to reside in the homeowner's residence;

(xi) Arrange for the homeowner to have an option to repurchase the homeowner's residence; or

(xii) Engage in any documentation, grant, conveyance, sale, lease, trust, or gift by which the homeowner clogs the homeowner's equity of redemption in the homeowner's residence; or

(2) Systematically contacts owners of property that court records or newspaper advertisements show are in foreclosure or in danger of foreclosure.

**4.** " 'Foreclosure consulting contract' means a written, oral, or equitable agreement between a foreclosure consultant and a homeowner for the provision of any foreclosure consulting service or foreclosure reconveyance." RP § 7-301(c).

**5.** " 'Homeowner' means the record owner of a residence in foreclosure . . . ," which is occupied by the owner. RP § 7-301(i) and (j).

**6.** "Foreclosure reconveyance" means a transaction involving:

(1) The transfer of title to real property by a homeowner during or incident to a proposed foreclosure proceeding, either by transfer of interest from the homeowner to another party or by creation of a mortgage, trust, or other lien or encumbrance during the foreclosure process that allows the acquirer to obtain legal or equitable title to all or part of the property; and

(2) The subsequent conveyance, or promise of a subsequent conveyance, of an interest back to the homeowner by the acquirer or a person acting in participation with the acquirer that allows the homeowner to possess the real property following the completion of

after the date the homeowner signed the document of sale. RP § 7–305. The time during which the homeowner may rescind does not begin to run until the foreclosure consultant has complied with the requirements contained in § 7–306. RP § 7–306(e). A foreclosure consultant may not receive any compensation until after the consultant has performed all services the consultant contracted to perform, may not charge more than 8% interest on any loan the consultant makes to the homeowner, and may not take any security to secure payment of compensation. RP § 7–307.

If a foreclosure reconveyance is involved, the foreclosure purchaser [7] shall provide the homeowner with a document which, *inter alia*, describes the terms of any foreclosure conveyance, any related agreement allowing the homeowner to remain on the property or to repurchase, and the homeowner's right of rescission. RP § 7–310. The time for rescission does not begin to run until the foreclosure purchaser has complied with the requirements. RP § 7–310(e). During the 3–day rescission period, a deed to the property may not be recorded. RP § 7–310(k).

A foreclosure purchaser may not enter into a foreclosure reconveyance with the homeowner, unless the foreclosure purchaser verifies that the homeowner has a reasonable ability to make lease payments, if there is a leaseback, and a reasonable ability to repurchase the property within the terms of the right to repurchase. RP § 7–311. The foreclosure purchaser is also prohibited from engaging in various other unfair or deceptive practices. RP § 7–311(b)(2)-(5). The foreclosure purchaser may not record any document of title until after the homeowner's right to rescission has expired. RP § 7–311(b)(6).

---

the foreclosure proceeding, including an interest in a contract for deed, purchase agreement, land installment sale, contract for sale, option to purchase, lease, trust, or other contractual arrangement. RP § 7–301(f).

7. " 'Foreclosure purchaser' means a person who acquires title or possession of a deed or other document to a residence in foreclosure as a result of a foreclosure reconveyance." RP § 7–301(e).

A bona fide purchaser for value or bona fide lender for value who enters into a transaction with a homeowner or a foreclosure purchaser when a foreclosure consulting contract is in effect or during the period when a foreclosure reconveyance may be rescinded, without notice of those facts, receives good title to the property, free and clear of the right of the parties to the foreclosure consulting contract or the right of the homeowner to rescind the foreclosure reconveyance.

RP § 7–311(e).

The Attorney General may enforce PHIFA by requesting injunctive relief, *see* RP § 7–319, and a homeowner may bring an action for damages. RP § 7–320. A court may award reasonable attorney's fees, and if the statutory violation was knowing or wilful, may treble the amount of actual damages. *Id.*

PHIFA does not apply to various entities enumerated in RP § 7–302(a), except as provided in subsection (b). Subsection (a) includes

(3) (i) A person doing business under any law of this State or the United States regulating banks, trust companies, savings and loan associations, credit unions, or insurance companies, while the person performs services as a part of the person's normal business activities; and

(ii) Any subsidiary, affiliate, or agent of a person described in item (i) of this item, while the subsidiary, affiliate, or agent performs services as a part of the subsidiary's, affiliate's, or agent's normal business activities.

Subsection (b) provides that the statute does apply to "an individual" who is "functioning in a position listed under subsection (a)" and "is engaging in activities or providing services designed or intended to transfer title to a residence in foreclosure directly or indirectly to that individual, or an agent or affiliate of that individual."

## Factual Background

On August 27, 2007, appellees initiated this foreclosure action against Ms. Wilson. The action was premised on a promissory note dated December 18, 2006, signed by LaShawn Wilson as borrower, and payable to Wells Fargo Bank, N.A.("Wells Fargo"). The note was secured by a deed of trust dated December 18, 2006, signed by LaShawn Wilson as borrower, and securing a loan in the amount of $482,000.00. According to appellees, the note was assigned to U.S. Bank, but Wells Fargo continued to service the loan.

On September 20, 2007, U.S. Bank purchased the property at foreclosure sale. On October 25, 2007, appellant filed a motion to intervene, which was granted. On the same date, appellant filed exceptions to the sale alleging, in essence, that she was the victim of fraud, and pursuant to PHIFA, the deed from her to Ms. Wilson was void; thus, appellees had no enforceable rights.

On January 17, 2008, the court conducted a hearing on appellant's exceptions. Appellant testified to the following. Appellant and her then husband purchased the property several years ago, and, after they were divorced, appellant owned the property. Prior to this foreclosure, the property was the subject of foreclosure actions on at least four occasions. On August 25, 2006, appellant's then mortgagee, Ameriquest Mortgage Company, initiated foreclosure proceedings. In October or November, appellant heard a radio advertisement by Metropolitan Money Store Corporation of Lanham, Maryland ("MMS"), advising that it could help people in foreclosure. Appellant went to MMS' location and met with Joy Jackson, who identified herself as the owner of MMS. Appellant signed "paperwork to get the procedure started." Appellant described her understanding of the procedure:

My understanding was that ... was that they would ... that they had investors who would help me to save my house, and that they would refinance the house. It would be in someone else's name. I would be able to live in the house. They would pull some equity out, and put it into an

escrow account that would pay the mortgage, and that would give me time to get my financial ... to get back ... back ... well, financially get healthy again and get taking care of some of the bills that I had at that time.

Appellant was not told who the lender or investor would be. Well, at the end of the one year period or less if I chose to, that I would be able to resume ... refinance the house. Put the loan back in my name. And, that I would just start paying on the mortgage. Any money left in the escrow account at the point in time when I decided that I wanted to refinance to put the loan back in my house, would come back to me.

On December 18, 2006, appellant attended a closing and signed approximately "forty" documents. The settlement was conducted by Regional Title and Escrow ("RTE"). The documents included a deed conveying the property to LaShawn Wilson, a HUD 1 settlement statement, and a lease from Ms. Wilson to appellant. The deed and HUD 1 were admitted into evidence. Appellant testified that she understood money from the equity in the property would be placed in an escrow account and that money would be used to pay the new mortgage. She understood that she would not have to make any payments for a year.

Appellant testified that she signed two documents relating to MMS' "mortgage reversal," which authorized the payment of fees and recited that "Fordham and Fordham Investment Group" would assist her in resolving credit issues. The documents also provided that Fordham and Fordham would open an escrow account relating to the property. Appellant understood that Fordham and Fordham would hold the escrow monies and pay the new mortgage.

The HUD 1 reflects a sales price of $482,000, a payoff of the mortgage to Ameriquest Mortgage Company in the amount of $379,949.92, and after other deductions, cash to appellant in the amount of $81,650.97. Appellant testified that she did not receive that amount of cash. She identified a "fee sheet for foreclosure reversal program," which was admitted into evi-

dence. The document reflects that appellant received $5,074.78 in cash and that $50,419.00 was paid into an escrow account. It also reflects "closing cost" in the amount of $20,134.17, payment to "Fordham and Fordham" in the amount of $10,000.00, and a payment to "investor" in the amount of $10,000.00.

Appellant also identified and introduced into evidence a document providing appellant a right to repurchase the property after 12 months, for a price of $482,000.00. According to the document, appellant agreed to resolve any negative credit balances as of December 18, 2006, the intent being to improve her credit score in order to qualify for refinancing to enable repurchase.

In March 2007, appellant became aware that payments were not being made to Wells Fargo, and she contacted Ms. Wilson. Ms. Wilson was aware of a pending State investigation of MMS and advised appellant. Appellant contacted the Department of Labor, Licensing, and Regulation ("DLLR") and also contacted Wells Fargo. Wells Fargo advised appellant that payments were not being made on the loan.

Appellant introduced into evidence a document purporting to be signed by Ms Wilson, dated March, 2007. The document, according to appellant, was faxed to her by Ms. Wilson. The document recites that Ms. Wilson was contacted by Wells Fargo and advised that her mortgage payments were late, and she replied that she did not have a loan with Wells Fargo and that it was being paid with a "fraudulent" account. The document also indicated that the fraud had been committed by Joy Jackson with MMS.

Appellant attempted to introduce into evidence documents identified as exhibit 16. Appellant testified that the documents were provided to her by Ms. Wilson. The court sustained appellees' objection to the admission of the documents. The documents consist of an "ID Theft Affidavit" and a "Fraudulent Account Statement." The documents are printed forms which purport to have been completed and signed by Ms. Wilson on December 12, 2007. In essence, the documents

assert that MMS used Ms. Wilson's personal information without her consent and opened an account with Wells Fargo without her consent.

Appellant testified that she had no knowledge of any connection between MMS and any mortgage companies or banks.

At the time of the transactions, appellant was never advised of her right to rescind any portion of the transactions involving the property. She became aware of her right to rescind under PHIFA when she contacted counsel in late 2007, and in August, 2007, she recorded among the land records of Charles County a "rescission and cancellation of foreclosure consultant contract and foreclosure reconveyance deed."

Appellant called David Schnickner to testify. He testified that he was an investigator with DLLR in the enforcement section of the financial unit, charged with the responsibility of investigating licensees. MMS was licensed by DLLR as a mortgage broker. He verified that he spoke to appellant and that she told him there was equity in the property in the approximate amount of $130,000.00, and that she had received approximately $5,000.00

Finally, appellant called Brian Terlinsky, who appeared as custodian of records for the substitute trustees. Mr. Terlinsky was a member of the law firm to whom the note and deed of trust were referred for foreclosure. Wells Fargo advised the witness that the loan had been assigned to U.S. Bank, but Wells Fargo had continued to service the loan. The note was endorsed in blank on December 18, 2006, but the witness had no knowledge as to when it was assigned to U.S. Bank.

At the close of appellant's evidence, appellant's counsel requested an opportunity to present a "summation." The court agreed, and the parties presented oral argument. At the conclusion of argument, the court granted the "motion for judgment" and overruled appellant's exceptions. The court, assuming that PHIFA had been violated and that fraud had been committed by MMS, RTE, and/or Fordham and Fordham, found no evidence that any employees of Wells Fargo or its assignee were involved. The court found that the above

entities were not agents of Wells Fargo. The court was also not persuaded that Ms. Wilson was involved and indicated that she may have been a victim, along with appellant and Wells Fargo. The court concluded that Wells Fargo, or if not, its assignee, was protected by RP § 7–311(e) as a bona fide lender or assignee.

## Contentions

The following are appellant's contentions, as distilled and rephrased by us, based on our reading of appellant's brief and reply brief.

First, appellant acknowledges that PHIFA exempts certain entities, *see* RP § 7–302(a), but contends that it does not exempt a bank acting as a trustee for a mortgage backed security ("MBS").

Second, appellant contends that agreements in violation of PHIFA are void, and thus, Wells Fargo and U.S. Bank acquired no rights under the documents in question. Appellant explains that appellant was never given the statutorily required notices; thus, the time during which appellant could rescind never began to run, pursuant to RP § 7–310(e); and the documents could not be validly recorded because the right to rescind had not expired, pursuant to RP §§ 7–310(k) and 7–311(b)(6). Appellant acknowledges that whether agreements in violation of a statute are void is a question of legislative intention and argues that here the intention is clear because of the prohibition against recording.

Third, appellant contends that, if the transactions were not void, appellees cannot prevail under RP § 7–311(e) because MMS, RTE, and/or Wilson were agents of Wells Fargo and their knowledge was imputed to Wells Fargo and, in the alternative, Wells Fargo was on notice of sufficient facts to impose a duty to make appropriate inquiries. With respect to the latter, appellant points out there was a pending foreclosure action and Wells Fargo is constructively charged with that knowledge, repeats the argument that the transactions were void, and, in her reply brief, states:

Following the passage of PHIFA, a reasonably prudent lender or MBS [mortgage backed security] acquiring interest to a property subject to foreclosure at the time of the transaction would have inquired whether the sale was connected with a foreclosure consulting contract or foreclosure reconveyance. The record below reveals that neither Wells Fargo nor Assignee to demonstrate what [sic], if any, steps to inquire about fraud reported to it by Ms. Julian and Ms. Wilson or even whether PHIFA was applicable to the transaction.

Fourth, appellant contends that appellees cannot be bona fide because the promissory note in question does not comply with Maryland Code (2002 Repl. Vol.), § 3–204(c) of the Commercial Law Article ("C.L.").

Fifth, even if U.S. Bank as assignee was bona fide, RP § 7–311(e) does not extend to assignees.

Sixth, the burden of proof is on appellees to prove that Wells Fargo and/or U.S. Bank were bona fide, and they failed to meet that burden.

Seventh, once appellant filed a notice of rescission, in August 2007, appellees could not foreclose but had to file a declaratory judgment action.

Eighth, the court erred in refusing to admit into evidence documents identified as appellant's exhibit 16 for identification and which were described above.

Appellees moved to dismiss this appeal, contending that it is moot because appellant (1) abandoned the property and her claim to rescission, and (2) failed to file a supersedeas bond as required by the circuit court. On the merits, appellees disagree with all of appellant's contentions.

### Motion to Dismiss

Appellees contend this appeal is moot because appellant vacated the property and purchased a new home. The contention is factually supported by an affidavit by counsel for appellees in which the affiant states that, on April 28, 2008, he

was advised by appellant's counsel that appellant "had vacated the subject property of the appeal and had purchased a new townhouse." Appellees argue that appellant acted inconsistently with her desire to rescind the transaction and that it may be difficult to restore the status quo.

■ We disagree. The act of vacating the property is not necessarily inconsistent with rescission, and the record is insufficient to make that determination. Moreover, appellant has asserted other claims, including that the transactions were void ab initio.

The circuit court, by order dated September 16, 2008, ordered appellant to post a bond in the amount of $430,000 "or such amount sufficient to secure that amount pursuant to Maryland Rule 8–423(b)(2)" as a condition to prosecution of this appeal. Appellees contend that the appeal should be dismissed for failure to post the bond.

■ Again, we disagree. In this case, the purchaser at the foreclosure sale was the mortgagee, as assignee of the original mortgagee. The original mortgagee was the servicer of the loan. In addition, appellant alleges fraud in the transactions. Finally, appellant's appeal from the circuit court order requiring a bond is pending in this Court but has not been briefed. Under these circumstances, we decline to dismiss this appeal.

### The Merits

#### Does PHIFA apply?

PHIFA does not apply to "a person," a subsidiary, affiliate, or agent, doing business under laws regulating banks but does apply to an "individual" doing such business if the "individual" is engaged in activities intended to transfer title to a residence in foreclosure directly or indirectly to that "individual," an agent or affiliate. Appellant argues that the National Banking Act, 21 U.S.C.A. §§ 21, *et. seq.*, does not preempt state consumer protection laws like PHIFA when the bank in question is acting as trustee for a MBS because investors own the beneficial interest in the loans. Thus, the effect of any

liability by others affecting the value of the loans falls on the investors, not the bank. Consistent with that, according to appellant, PHIFA does not expressly exempt MBS.

We agree with appellees that PHIFA does not regulate banks, but appellant does not contend Wells Fargo or U.S. Bank violated PHIFA. Appellant contends that, because PHIFA was violated by others, the transactions were void or, if not, Wells Fargo and U.S. Bank are not bona fide lenders under § 7–311(e). Thus, we must examine those issues.

### Are agreements in violation of PHIFA void?

We conclude that the plain language of the statute clearly indicates the legislative intent to make such agreements voidable, not void. Void ab initio means that an agreement is null from the beginning and nothing can cure it. *See* Black's Law Dictionary 1568 (7th ed. 1999). Voidable means that an agreement may be avoided or confirmed, but is not absolutely void and of no effect. *Id.* Under PHIFA, the remedy to a homeowner, other than damages, is rescission. If agreements in violation of the statute were intended to be void, the statute would expressly so provide. Instead, it provides a private cause of action for damages, continues the homeowner's right to rescind indefinitely except as to a bona fide purchaser/lender, and authorizes the Attorney General to seek injunctive relief. Rescission is a right to cancel, *see Maslow v. Vanguri*, 168 Md.App. 298, 324, 896 A.2d 408 (2006), but a homeowner is not required to rescind. The legislature clearly differentiated between void and voidable because it declared: "Any provision in a foreclosure consulting contract or other agreement concerning a foreclosure reconveyance that attempts or purports to waive the homeowner's rights under this section, consent to jurisdiction for litigation or choice of law in a state other than Maryland, consent to venue in a county other than the county in which the property is located, or impose any costs or filing fees greater than the fees required to file an action in a circuit court, is *void*." (Emphasis added.). RP § 7–310(f). Similarly, RP § 7–318 provides that any "waiver by a homeowner of the provisions of

this subtitle is void and unenforceable as contrary to public policy."

■ If agreements in violation of the statute may be declared void ab initio, they would be void only as to those persons with notice because preexisting common and statutory law, incorporated into RP § 7–311(e), protects bona fide purchasers and lenders from the right of the homeowner to rescind, and it protects their title. Thus, not only are banks not regulated under PHIFA, their property interests are protected when they are in the position of bona fide purchasers and lenders.

■ Our conclusion is consistent with the well-established general rule that fraud in the sale of real estate renders a contract *voidable* at the option of the injured party. *See Gunby v. Sluter*, 44 Md. 237 (1876) ("If a contract is made for the sale of lands or houses, either by public or private contract, and a deposit ... is paid thereon, and it afterwards appears that any material representation ... has been made, either by the vendor himself, or by his agent ..., the vendee may disaffirm the contract ....") (citations omitted). On the other hand, if property is sold to a bona fide purchaser by one who acquired the property by fraud, while the agreement between the parties thereto is voidable, the bona fide purchaser takes an indefeasible title. *Harding v. Ja Laur Corp.*, 20 Md.App. 209, 214, 315 A.2d 132 (1974) ("A deed obtained through fraud, deceit or trickery is voidable as between the parties thereto, but not as to a bona fide purchaser."). In other words, the title of a bona fide purchaser, without notice of defects, is not vitiated even though a fraud was perpetrated by his vendor upon a prior title holder. *Id.* While there have been instances where transactions have been held to be *void* as to a bona fide purchaser, those instances have not occurred in cases of fraud. *See Harding*, 20 Md.App. 209, 315 A.2d 132 (holding that a forged deed, unlike one procured by fraud, deceit or trickery, is void ab initio, or void from its inception, and, consequently, there can be no bona fide holder of title under the deed).

The protection of bona fide persons, i.e., acting without actual or constructive notice, dates back to English common and statutory law. A change in the general rule would have a significant effect on the marketplace. If the legislature had intended to change it, it would have expressly done so.

*Are Wells Fargo and/or U.S. Bank bona fide purchasers or lenders?*

Appellant argues that Wells Fargo was not a bona fide lender because one or more persons who violated PHIFA was its agent, and thus, the knowledge of those persons was imputed to Wells Fargo. There was no evidence whatsoever that MMS, RTE, or Ms. Wilson were agents of Wells Fargo. The only evidence as to Ms. Wilson was that her name appeared on the documents as buyer, borrower, and mortgagor. To the extent there was evidence as to her knowledge, it indicated that she was a victim of MMS. MMS and RTE acted as independent contractors, with no indication of any connection with Wells Fargo, and there was no evidence that Wells Fargo had the power to control how they did their job.

We note that the determination of the existence of a principal-agent relationship is generally a question of fact. *Insurance Co. of North America v. Miller*, 362 Md. 361, 372, 765 A.2d 587 (2001). "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Bowser v. Resh*, 170 Md.App. 614, 632–33, 907 A.2d 910 (2006) (quoting Restatement (Second) of Agency § 1 (1958)). There are three characteristics, which, while not exclusive, are particularly relevant to the determination of the existence of a principal-agent relationship: (1) the agent's power to alter the legal relations of the principal; (2) the agent's duty to act primarily for the benefit of the principal; and (3) the principal's right to control the agent. *Id.* (citing Restatement (Second) of Agency §§ 12–14 (1958) (other citations omitted)). The creation of an agency relationship ultimately turns on the parties' intentions as manifested by their agreements or actions. *Green v. H &*

*R Block, Inc.*, 355 Md. 488, 503, 735 A.2d 1039 (1999) (other citations omitted). While the agent and principal must both consent to the relationship, an agency relationship can be created by express agreement or by inference from the acts of the agent and principal. *Green*, 355 Md. at 503, 735 A.2d 1039. *See Medical Mut. Liab. v. Mutual Fire*, 37 Md.App. 706, 712, 379 A.2d 739 (1977) ("The relation of principal and agent does not necessarily depend upon an express appointment and acceptance thereof, but it may be implied from the words and conduct of the parties and the circumstances."). As there is absolutely no evidence of the existence of an actual express agency relationship here, we can only assume that appellant's argument is that the principal-agency relationship existed by inference. Where, however, a party asserts a claim that is dependent upon an agency relationship created by inference, that party has the burden of proving the existence of the principal-agent relationship, including its nature and extent. *Green*, 355 Md. at 504, 735 A.2d 1039. Appellant failed to produce any evidence to allow the fact-finder to conclude that such a relationship existed.

Furthermore, with regard to knowledge, the general rule is that the knowledge of an agent is attributable to the principal. When the interests of the agent and the principal are adverse, however, the agent's knowledge cannot be imputed to his or her principal. *See Hecht v. Resolution Trust*, 333 Md. 324, 345, 635 A.2d 394 (1994) (citing *Lohmuller Bldg. Co. v. Gamble*, 160 Md. 534, 541, 154 A. 41 (1931)). Thus, even assuming arguendo that MMS, RTE, or Ms. Wilson were agents of Wells Fargo, because their alleged fraudulent interests were adverse to the interests of Wells Fargo, their knowledge could not be attributable to Wells Fargo.

Appellant also contends that Wells Fargo was on inquiry notice but offers nothing to support that argument, other than constructive notice from the pending foreclosure action. That is insufficient. PHIFA contemplates a pending foreclosure. Homeowner means "the record owner of a residence in fore-

closure." RP § 7–301(i). Real Property § 7–311(e) contemplates a pending foreclosure in that it applies when the bona fide purchaser or lender enters into the transaction "when a foreclosure consulting contract is in effect or during the period when a foreclosure reconveyance may be rescinded. . . ."

█ Next, appellant contends that Wells Fargo and U.S. Bank cannot be bona fide because the note did not comply with C.L. § 3–204(c).[8] We agree with appellees that this argument was not made below and, therefore, is not properly before us. Appellant argued below that the note or its assignment had not been recorded, but appellant does not make that argument on appeal. Moreover, Mr. Terlinsky testified that there was an assignment by virtue of an endorsement in blank, on December 18, 2006, which he described as standard practice with commercial paper.

Appellant contends that the protection in RP § 7–311(e) does not extend to U.S. Bank because that subsection does not expressly include assignees. In light of our conclusion as to Wells Fargo, that the evidence supports the circuit court's conclusion that it was a bona fide lender, we have no need to address whether the section extends to an assignee when the assignor is not bona fide. We have no difficulty in concluding that a bona fide assignee has the same protection as a bona fide assignor.

Appellant contends that appellees had the burden to prove that Wells Fargo and U.S. Bank were bona fide, and failed to do so. Generally, the burden is on the exceptant to prove the basis of exceptions. *See* Maryland Rule 14–305; *Greenbriar Condominium v. Brooks*, 387 Md. 683, 742, 878 A.2d 528 (2005). Appellant does not appear to take issue with that, but argues that Wells Fargo and U.S. Bank were on notice sufficient to make inquiry, the same argument addressed

---

**8.** Subsection (c) provides: "For the purpose of determining whether the transferee of an instrument is a holder, an indorsement that transfers a security interest in the instrument is effective as an unqualified indorsement of the instrument."

above, and this was sufficient to shift the burden to appellees to prove bona fides.

■■■■ Appellant is correct that case law establishes the principle that, when seeking to set aside a conveyance as fraudulent, while there is a presumption of good faith and the person alleging fraud has the burden of proving it, if the person alleging fraud shows the grantee had knowledge of "suspicious circumstances," the burden shifts to the grantee to show that the transaction was bona fide. *Berger v. Hi–Gear Tire & Auto Supply, Inc.*, 257 Md., 470, 475, 263 A.2d 507 (1970). *Accord A.V. Laurins & Co., Inc., v. Prince George's County*, 46 Md.App. 548, 555, 420 A.2d 982 (1980). The difficulty with appellant's argument is that the evidence was insufficient to establish notice by Wells Fargo or U.S. Bank sufficient to impose a duty to make inquiry. Thus, the circuit court did not err in refusing to shift the burden of proof.

Next, appellant contends that appellees were required to pursue a declaratory judgment action in lieu of a foreclosure. Appellant argues that, because Wells Fargo was advised in March 2007 of the alleged fraud and everyone was put on notice when the notice of rescission was recorded in the land records in August, 2007, appellees could not foreclose. First, this contention was first made in the reply brief and is not properly before us. Second, the time for determining bona fide status was at the time of the transaction in question. Finally, appellant cites no authority for the proposition that appellees were required to file a declaratory judgment action, and we are aware of none.

Lastly, appellant contends the court erred in refusing to admit into evidence the documents identified as exhibit 16. Appellant argues they come within various exceptions to the general rule excluding hearsay. We shall not decide that issue because, assuming the documents were admissible, their exclusion was not prejudicial to appellant. The content of the documents is consistent with other evidence that was intro-duced, indicating that Ms. Wilson was a victim and not a

participant in the alleged fraud. That does nothing to demonstrate that Wells Fargo and U.S. Bank were not bona fide.

**MOTION TO DISMISS APPEAL DENIED. JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**