Billings, Thomas P., J.
For the reasons that follow, the Motion of Countrywide Home Loans, Inc. for Summary Judgment is ALLOWED, and Plaintiffs Counter-Motion for Summary Judgment is DENIED.
FACTS
The following facts from the summary judgment record[1] are either undisputed or taken here in the light most favorable to the plaintiff. The plaintiff, Gail Brown, is a retired crossing guard, widowed and in her sixties, with an eighth-grade education. She lives in Littleton, in a home that was in her husband’s family since about 1961. Her income of $1,200 per month is comprised of her husband’s pension and SSDI benefits (she suffers from fibromyalgia and neuropathy).
Since acquiring sole title to the home from her husband in 1991, Mrs. Brown has taken out several mortgage loans. In the spring of 2006 she was facing foreclosure at the hands of Wells Fargo, holder of the first mortgage.
Help arrived — or so Mrs. Brown thought — in the person of Kaprise Carlson, a mortgage originator for Peterson Financial Network, Inc., operating out of Sacramento, California. Carlson evidently had gotten Mrs. Brown’s name from publicly available information concerning pending foreclosures. She sent Mrs. Brown a mailing with the Peterson Financial name on it, and Mrs. Brown called her.
Saying she was part of a “program to help the elderly” and that Mrs. Brown did not need a lawyer, Carlson persuaded her to execute a Purchase and Sale Agreement whereby she agreed to convey the home to Carlson. She promised Mrs. Browm that she would continue living in the home in exchange for paying her $900 in monthly rent, that Carlson would take care of the mortgage, and that once Mrs. Brown got back on her feet the house would be hers again. Mrs. Brown, financially unsophisticated and terrified of becoming homeless, agreed.
On June 9, 2006 Mrs. Brown executed a quitclaim deed in favor of Carlson. The deed, when Mrs. Brown signed it, recited consideration of “ DOLLARS ($ .00). It was later altered, however, to show consideration of $350,000 and a change in its description of Carlson (from a ’’single" to an “unmarried woman”).[2] The deed was not recorded right away.
Carlson took out first and second mortgage loans, in the amounts of $280,000 and $70,000 respectively, secured by the Brown home. The lender on both loans was Countrywide.
The settlement agent for the transaction was Lender Services Direct, Inc. (“LSD”). LSD prepared three versions of a Real Estate Settlement Procedure Act (“RESPA”) statement, giving settlement dates of June 8 (the first version) and July 14 (the second and third versions), with slightly different figures for the disbursement of the $350,000 in mortgage loan proceeds.[3] See 12 U.S.C. §2601 et seq.; 24 C.F.R. §3500.8(a), (b). Each version is signed by Carlson, but the signature line for the Seller is left blank on all three.
In the final version, $205,804.67 of the loan proceeds is shown as going to Wells Fargo and $26,427.08 to HFC, the second mortgagee, whose discharges were duly obtained and recorded. After deductions for closing costs, a partial month’s interest and insurance and tax reserves payable to the new lender, and back taxes, a net of $109,676.85 is shown as due the Seller (i.e., Mrs. Brown). In actual fact, however, LSD on July 17 and 18 wired the funds in nearly equal portions to Carlson’s accounts at two separate banks.[4]
*62 Countrywide’s mortgages were recorded in the Mid-dlesex South Registry of Deeds on July 20, along with the deed from Brown to Carlson. Mrs. Brown understood that her home was being “refinanced,” but she never saw the new mortgages and did not understand that she had sold her house to Carlson;[5] nor did she receive any of the proceeds of the sale (other than through the discharge of the existing mortgages).
As noted previously, LSD prepared the settlement statement (each of the three versions) and distributed the settlement proceeds (i.e., the $350,000 loaned by Countrywide). The Quitclaim Deed bears a notation indicating that it was prepared by Thomas Hussey of LSD and, when recorded, should be returned to Kaprise Carlson; the two mortgages bear similar notations stating that they were prepared by Dalin Suon (not further identified) and should, after recording, be sent to LSD. A Lender Services Direct accounting of the distribution of the closing proceeds (Verified Complaint, Ex. E) identifies Peterson Financial Network as its “Customer.” There is no other direct evidence concerning whether LSD acted as the agent of any party, or as an independent contractor.
Mrs. Brown mailed her $900 monthly rent checks to Carlson in California[6] for several months. They had a few conversations about such matters as a sink that ■ needed unclogging (for which Mrs. Brown thought Carlson, as the “landlord,” was supposed to pay).
Carlson did not make any payments on the two Countiywide mortgages. In May 2007, a sheriff came to Mrs. Brown’s door with papers to be served on Carlson, pertaining to a foreclosure. Mrs. Brown mailed the papers to Carlson’s Sacramento address and tried to call her, but discovered that her cell phone had been shut off.[7]
DISCUSSION
I. Standard of Review
Summary judgment must be granted where there are no material facts in dispute and the moving party has established that it is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of establishing the absence of a triable issue. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The facts are to be read in the light most favorable to the non-moving party. G.S. Enter., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 263 (1991). In determining whether there are genuine issues of material fact, the court may consider the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The non-moving party cannot defeat the motion simply by resting on the pleadings and mere assertions that there are disputed facts. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
II. Relationship between LSD and Countrywide
As her primary avenue to relief against Countrywide, Mrs. Brown asserts that LSD acted as the lender’s agent. Under familiar principles, a principal is chargeable with acts that its agent performs within the scope of employment, and is deemed to possess the knowledge an agent gains in the course of employment. See DeVaux v. American Home Assurance Co., 387 Mass. 814, 818 (1983); Lawrence Sav. Bank v. Leuenson, 59 Mass.App.Ct. 699, 704-05 (2003). Mrs. Brown concedes that she cannot show that LSD acted under Countrywide’s express authority, but maintains that LSD operated under Countrywide’s apparent authority. See Kansallis Finance Ltd. v. Fern, 421 Mass. 659, 665 (1996). Apparent authority arises where a principal engages in conduct that reasonably causes a third party to believe that the agent has the authority to act on the principal’s behalf. See Haufler v. Zotos, 446 Mass. 489, 498 n.22 (2006); Hudson v. Mass. Prop. Ins. Underwriting Ass’n, 386 Mass. 450, 457-58 (1982).
Mrs. Brown has not shown, however, that Countrywide took actions that reasonably could have led her to believe that LSD was acting on its behalf. As settlement agent, LSD conducted the settlement and was responsible for completing the required statements and supplying them to the parties. See 12 U.S.C. §2603 (2006); Murray v. Fleet Mtg. Corp., 936 S.W.2d 212, 216 (Mo.Ct.App. 1996). Countrywide had no contact with Mrs. Brown, and indeed, in her deposition she acknowledged that not only does she have no evidence that LSD acted as Countrywide’s agent, she stated that she had no awareness of LSD at all, including its involvement in the deed transfer and Carlson’s mortgaging of the house. Cf. id., 936 S.W.2d at 217 (no apparent agency where plaintiff had no communication with lender). Without evidence of actions taken by Countrywide which would have led Mrs. Brown to believe LSD acted on its behalf, there can be no finding of an agency relationship based on apparent authority. See Haufler, 446 Mass. at 498, n.22. See also Julian v. Buonassissi, 183 Md.App. 678, 963 A.2d 234, 246 (Md.Ct.Spec.App. 2009) (rejecting agency argument given the lack of evidence that lender had authority over settlement agent or others perpetrating foreclosure rescue scam).
Further, even if an agency relationship had existed, Countrywide would not be chargeable with LSD’s knowledge and conduct because LSD’s involvement in the alleged fraudulent acquisition and encumbrance of Mrs. Brown’s house worked against Countrywide as well as Mrs. Brown. Courts do not “impute to the principal notice to an agent regarding a fraudulent act in which the agent is engaged against the principal.” Lawrence Sav. Bank v. Levenson, 59 Mass.App.Ct. 699, 704-05 (2003), citing Allen v. S. Boston R.R. Co., 150 Mass. 200, 206 (1889). The transaction conducted by LSD has exposed Countrywide to litigation and *63 risks compromising its security interest in the house. See Julian, 963 A.2d at 246 (refusing to impute knowledge where settlement agent’s and others’ alleged fraudulent acts in a foreclosure rescue scheme were adverse to the mortgagee’s interest). Accordingly, this conflict of interest also stands in the way of charging Countrywide with LSD’s conduct and/or knowledge under an agency theory.
III. Fraud in the Factum
Mrs. Brown next argues that Countrywide has no cognizable interest in the house because the deed transferring it to Carlson is void. In her deposition she acknowledges that she signed the deed, precluding a forgery claim. However, she also raises a fraud in the factum defense by arguing that she was deceived into thinking she signed a mortgage refinancing document rather than a deed.
Unlike fraud in the inducement, addressed infra, which occurs when a pariy signs a document because she was misled as to its terms, fraud in the factum occurs when a pariy signs a legal instrument “without knowledge of its true nature or contents.’’ Langley v. FDIC, 484 U.S. 86, 93 (1987).
The misrepresentation must go to the essence of the transaction. Fraud in the factum does not occur: when the essential nature of the document. .. has been accurately represented or is understood by the signer; when the signer is capable of reading and understanding the content of the document; and when the element misrepresented does not involve the true nature or contents of the instrument, but concerns a term or factor in the transaction, even an important one, but not going to the essence.
Federico v. Brockton Credit Union, 39 Mass.App.Ct. 57, 63-64 (1995).
Fraud in the inducement is a “personal defense” that renders the instrument voidable: it cannot be enforced by the fraudulent pariy, but it can be enforced by a bona fide purchaser[8] who had no notice of the fraud. See id.; Langley, 484 U.S. at 94. Conversely, fraud in the factum “is one of the ‘real’ defenses that can be interposed against even the most purehearted and scrupulously attentive holder in due course.” New Bedford Inst. for Sav. v. Gildroy, 36 Mass.App.Ct. 647, 657 (1994); see Langley, 484 U.S. at 94; G.L.c. 106, §3-305(a)(l)(iii) (in the case of a negotiable instrument, “the right to enforce the obligation of a party to pay an instrument is subject to ... a defense of the obligor based on . .. fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms”).
A document procured through fraud in the factum is void ab initio, because the signer never intended to sign such an instrument. See G.L.c. 106, §3-305, Notes. The party asserting fraud in the factum must show, however, that her ignorance was “excusable” due to her having had “no reasonable opportunity to obtain knowledge” about the true nature of the document before signing it. See id.; New Bedford Inst. for Sav., 36 Mass.App.Ct. at 658. In assessing whether a “reasonable opportunity” existed, courts consider “all relevant factors, including age, intelligence, education and business experience, ability to read and to understand English, reason to rely on the representations or to have confidence in the party making them, and the apparent necessity for acting swiftly.” F.D.I.C. v. Ruscont 808 F.Sup. 30, 40 (D.Maine 1992) (applying Massachusetts law); see G.L.c. 106, §3-305, Notes.
Cases of fraud in the factum are “rare,” Federico, 39 Mass.App.Ct. at 63; more often, a misrepresentation is found to have concerned a term but not the fundamental nature of a document. See id. at 63-64 (borrowers knew they were signing an commitment letter for a loan, but were misled as to how the interest rate adjuster would operate); Vasapoli v. Rostoff, 39 F.3d 27, 35 (1st Cir.1994) (plaintiffs misled as to temporal term of notes, but not as to whether they were notes).
Often, too, the signing party's failure to avail herself of a reasonable opportunity to discover the true nature of the document will stand in the way of a finding of fraud in the factum. As was said long ago, when someone who is
able to read, signs a bill or note, relying upon the assurance or the reading of a stranger that it is a different instrument... one of two innocent parties must suffer; but the bona fide holder is not only innocent, but free from all negligence ... if he can read, he ought to read; and he has no right to send his signature out into the world affixed to an instrument of whose contents he is ignorant. If he relies upon the word of a stranger, he makes that stranger his agent. He adopts his reading as his own knowledge. What his agent knows, he knows; and he cannot disaffirm the acts of that agent done within the scope of the authority he has intrusted to him.
Ort v. Fowler, 31 Kan. 478, 2 P. 580, 583 (1884), quoted in F.D.I.C. v. Culver, 640 F.Sup. 725, 730 (D.Kan.1986). See New Bedford, 36 Mass.App.Ct. at 658 (refusing to allow a fraud in the factum defense due to signatory’s negligence in failing to perform even a casual examination of the document, which would have revealed the fraud); Oakwood Mobile Homes, Inc. v. Barger, 773 So.2d 454, 461 (Ala. 2000) (“If the purchaser blindly trusts where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived”); Cash v. Titan Fin. Sucs., Inc., 58 A.D.3d 785, 788 (N.Y.App.Div. 2009) (rejecting fraud in factum claim where plaintiff had eleventh-grade education, could read and write, was not prevented from reading the documents nor forced to sign them, suffered from no physical or mental infirmity, but “nonetheless signed all of the closing documents without reading them”); Palumbo Ins. *64 Agency v. Irwin Bus. Fin. Corp., 2006 WL 1718280, 2004 Mass.Super.LEXIS 669 (Mass.Super. 2006; Fabricant, J.) (finding that signatories were assumed to know the contents of the contracts they signed because “[n]othing in the record indicates that [they] were in any way prevented from reading or understanding the contracts before signing them”).
In fact, only in the most extreme situations have courts of any jurisdiction found a fraud in the factum defense to be viable. Such cases typically involve lingustic or literacy barriers,[9] or special circumstances making it reasonable for the signer to rely on the representations of another.[10]
Mrs. Brown is an English speaker and is able to read, but acknowledges that she did not do so before signing the deed. See New Bedford, 36 Mass.App.Ct. at 658. Her deposition testimony raises the question of whether she would have understood the document even if she had read it: she maintained that she did not know the meaning of the words “Quitclaim Deed” and “convey,” and had never seen a mortgage before. Although she is of limited business experience, however, Mrs. Brown was not entirely unfamiliar with the mortgage process: she had taken out several in the years following her husband’s death. And, prior to signing the deed, she had also executed a purchase and sale agreement for the house. See Saunders v. Clancy, 2007 Mass. LCR LEXIS 23 at *34-35 (Mass. Land Ct. 2007) (finding no fraud in the factum since signatory had been involved in the creation of similar documents, and so it could be inferred that if she read the document in question, she would have understood it). Further, her dispute with Carlson regarding the sink repair also reveals that Mrs. Brown considered Carlson her landlord, suggesting she comprehended that ownership of the house had transferred to Carlson.
If she was unclear about the nature of the document she was signing, Mrs. Brown had reasonable opportunity to seek clarification. Although Carlson was pressuring her to sign and return the document to her in California quickly, the effect of this pressure was lessened since Carlson was a continent away. See Palumbo, 2004 Mass.Super.LEXIS 669 at *11. Therefore, Mrs. Brown had a reasonable opportunity to examine and seek help in understanding its contents while she alone possessed the document. See Savoy v. White, 788 F.Sup. 69, 73 (D.Mass. 1992) (finding no evidence to support fraud in the factum defense because the plaintiff did “not allege, for instance, that a false document was placed in such away as to conceal the words ‘MORTGAGE’ or ‘PROMISSORY NOTE’ on the face of the documents she signed, or that she was denied the opportunity to examine the contents of the agreements”).
Rather than seek clarification from someone she had reason to trust, Mrs. Brown elected to rely solely on the representations of a woman whom she had never met. While her financial insecurity and anxieties about losing her home likely made her more susceptible to any misrepresentations by Carlson, the evidence she has put forward falls short of what is required to create a triable issue as to fraud in the factum. See New Bedford Inst. for Sav., 36 Mass.App.Ct. at 657-58.
IV. Fraud in the Inducement
As discussed above, fraud in the inducement occurs when someone signs a document because she is misled regarding its terms. See Langley, 484 U.S. at 94. A fraudulently induced instrument is voidable by the defrauded party as against the defrauder, but is still enforceable by a bona fide purchaser.
Mrs. Brown’s allegations regarding Carlson’s actions in getting her to sign the deed and transfer the house are sufficient to form the basis for a fraud in the inducement defense, but this is only operable against Countrywide if it was not a holder in due course of its security interest in the house. “The burden of proving that a person was not a bona fide purchaser lies with the party making that claim” — here, Mrs. Brown. Dev-ine v. Nantucket, 449 Mass. 499, 512 (2007) (emphasis in original).
Under some circumstances — notably, where record title to a piece of real estate is challenged by one claiming an interest through an unrecorded instrument — "actual notice is required, and that term has been strictly construed." Board of Selectmen of Hanson v. Lindsay, 444 Mass. 502, 510 (2005); see G.L.c. 183, §4. In such a case, “no duty of inquiry results from the recital of a fact or facts which might or might not, according to the circumstances, be consistent with fraud or other disabling circumstance.” Richardson v. Lee Realty Corp., 363 Mass. 632, 635 (1974). The reasons for the “strict” approach in these cases pertain both to the allocation of risk, and to the integrity and reliability of the recording system.
Strict construction of actual notice may be justified in part because the holder of an unrecorded instrument could protect himself simply by recording it in the appropriate registry of deeds . . . Notice requirements are also a consequence of the intent of the registry laws to establish a record system on which purchasers can rely. “[P]urchasers should not be required to look beyond the registry of deeds further than is absolutely necessary.”

Id.

In certain other circumstances — for example, negotiable instruments — -the party claiming b.f.p. (holder in due course) status has the burden of proving it, Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 548 (1997), and there is an “inquiry notice” standard: a holder is not a holder in due course if he has actual knowledge or notice, or “from all the facts and circumstances known to him at the time in question he has reason to know ... ,” of a prior, adverse *65 claim to the instrument. Id. at 546-49 (quoting G.L.c. 106, §1-201(25)).
This case occupies a sort of nether region between these two, well-developed lines of cases: Mrs. Brown’s claim competes with Countiywide’s clean record title to an interest in real estate, but it does not arise from an unrecorded instrument. Richardson v. Lee Realty, quoted above, dealt with such a claim, but the court found it unnecessary to decide what standard — actual or inquiry notice — applied. Other cases, however, have come down on the side of actual notice where the competing claim is an equitable right of rescission. See, e.g., General Builders Supply Co. v. Arlington Co-Op. Bank, 359 Mass. 691, 697 (1971) (bank recorded mortgage discharge by mistake; “Since the facts on which the bank bases its claim for reformation were not a matter of record in the registry of deeds for the district in which the land in question was located, they do not bind persons who, without actual notice of such facts, subsequently become purchasers for value of an interest in the land”); Emmons v. White, 58 Mass.App.Ct. 54, 66 n.12 (same); In re Daylight Dairy Products, Inc., 125 B.R. 1, 3 (Bankr.D.Mass. 1991) (same).
These cases, and the policies behind the actual notice requirement for unrecorded instruments, speak with equal force to a case of fraud in the inducement. As between Mrs. Brown and Countrywide, Mrs. Brown was in the better position to protect her interests, by reading what she signed and seeking advice concerning what she did not understand. Permitting her claim to defeat that of one who took clean record title without notice of the fraud would, moreover, undermine the integrity of the recording system.
Finally, even applying an inquiry notice standard to these facts would not change the result. There is evidence in the record (copies of the deed with and without stated consideration, with the same signature by Mrs. Brown) that the deed was altered after Mrs. Brown signed it. A “material alteration of a deed by the obligee, without the consent of the obligor, will avoid such deed.” Adams v. Frye, 44 Mass. 103, 104 (1841). There is no evidence, however, that Countrywide, or anyone whose knowledge may be imputed to Countrywide, ever saw the deed in its pre-altered state. As recorded, the deed shows only changes “which might or might not, according to the circumstances, be consistent with fraud or other disabling circumstance,” because they might or might not have been made after Mrs. Brown’s signature and without her consent. See footnote 2, supra.
The HUD- 1A statement is also irregular in appearance, in that it is the wrong form for a purchase money mortgage, and the space for Mrs. Brown’s signature is blank. Neither the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) nor the HUD regulations thereunder (24 C.F.R. Part 3500), however, requires the borrower’s signature on the settlement statement. Moreover, although LSD, as settlement agent, was required to provide copies of the completed settlement statement to the borrower, seller, and lender (24 C.F.R. §3500.10(b)), this would have been done after the fact, since there was no in-person closing. Id., §3500.10(d). By the time it received the settlement statement (assuming it ever did), therefore, Countrywide had taken the mortgage and disbursed the loan proceeds, without notice of whatever the settlement statement might have told it. Finally, the use of the wrong form and the blank signature line suggest, at most, sloppy paperwork on the part of the settlement agent, not a fraud on Mrs. Brown and a resulting right to rescind.
Of course, the paper trail crossed over, from sloppy to damning, at the point that LSD disbursed to Carlson, rather than to Mrs. Brown, the $109,676.85 shown on the settlement statement as due the Seller. This was accomplished by two wire transfers which LSD originated from an account at South County Bank. There is no evidence in the record, however, that Countrywide — which had apparently entrusted the loan proceeds to LSD for disbursement — ever knew the details of the South County Bank transfers or their significance.
In short: the plaintiff has not shown that Countrywide had actual or even constructive knowledge of her victimization by Carlson and her resulting right of rescission, such as to defeat its status as a bona fide mortgagee for value. Countrywide, not Mrs. Brown, is therefore entitled to summary judgment.
ORDER
For the foregoing reasons, the Motion of Countrywide Home Loans, Inc. for Summary Judgment is ALLOWED, and Plaintiffs Counter-Motion for Summary Judgment is DENIED.

Neither side’s submission complies with Superior Court Rule 9A. Countrywide’s is defective in a matter of form only, in that the statement of facts is supported with record citations, but is not in numbered paragraphs. The plaintiffs statement of facts is in numbered paragraphs but has no citations to the record, a potentially serious defect. The record is not unduly large, however, and I have reviewed it on my own. For the potential consequences of ignoring the Rule’s requirements, see Dziamba v. Warner & Stackpole LLP, 56 Mass.App.Ct. 397, 401 (2002).

The alterations, accomplished by striking out original text with typed “X”s and adding new text, are apparent on the face of the deed. That they occurred after Mrs. Brown signed, however, would not be apparent without comparing the two copies made part of the record (one pre-, the other post-alteration, both bearing the identical signature of Mrs. Brown).

A legend at the bottom identifies the form as “Lender Services Direct Form HUD-1A REF RESPA.” HUD-1 is the official form for transactions with a seller (i.e., a sale and purchase financed by a federally guaranteed mortgage); HUD-1A is the form for transactions without sellers (i.e., a refinancing with a federally guaranteed mortgage). The LSD form used for all three version is a sort of amalgamation of the two official forms, in that it contains only the line items from HUD-1A but has columns for both Buyer and Seller to show debits and disbursements to each. LSD clearly knew this was a sale, since it completed the final version of the settlement state *66 ment showing (in the final version) $240,198.15 in debits to the seller’s account and a net of $109,676.85 going to the seller (the total equaling the $350,000 price on the deed, and the sum of the two Countrywide mortgage loans). The record offers no insight into why LSD used the HUD- 1A rather than the HUD-1 form.

$54,838.42 went to Carlson’s account at Bank of America; $53,242.43 to her account at American River Bank.

This is according to Mrs. Brown’s testimony. Mrs. Brown apparently did understand, however, that after the transaction Carlson had become her landlord, to whom she paid rent and who she expected to be responsible for household repairs (see text).

Mrs. Brown never met Carlson face to face. They talked on the phone, and Carlson sent documents to her and Mrs. Brown sent them back by Federal Express. Mrs. Brown had her signatures notarized at her bank; Carlson’s were attested by a California notary.

Mrs. Browm appears to have been the victim of a simplified version of the classic “mortgage rescue” scam. See Johnson v. Wheeler, 492 F.Sup.2d 492, 495-96 (D.Md. 2007), for a description of the scam in its prototypical form.

The term “bona fide purchaser” covers not only those who take fee title, but also the lender who advances funds in exchange for a mortgage, without notice of a title defect in the property taken as securily. See, e.g., Dalessio v. Baggia, 57 Mass.App.Ct. 468, 472 (2003).

See, e.g., Toscano v. Ameriquest Mortg. Co., 2007 U.S.Dist. LEXIS 81884 at *17 (E.D.Cal. 2007) (finding that the plaintiff, who spoke only Spanish, may have had no reasonable opportunity to learn the essential nature of loan documents he signed at the direction of lender’s notary, who spoke no Spanish); Anderson v. Ashby, 873 So.2d 168, 183-84 (Ala. 2003) (finding signatory’s illiteracy raised the possibility of fraud in the factum).

See, e.g., Pimpinello v. Swift & Co., 170 N.E. 530, 532 (N.Y. 1930) (finding fraud in the factum because “(i]n relying upon the word of one who had been his trusted lawyer, surely the plaintiff was less careless than was Thoroughgood in relying on the word of a stranger”), referring to Thoroughgood v. Cole, 76 Eng.Rep. 408, 409 (C.P. 1582) (classic fraud in factum case in which illiterate man relied on characterization of document by stranger); First Nat'l Bank v. Hall 151 N.W. 120, 122 (1915) (finding that it may have been reasonable for elderly signatory with poor eyesight and little business experience to rely on her attorney’s representation of a document); Rumfield v. Rumfield, 324 S.W.2d 304, 306 (Tex.Civ.App 1959) (finding fraud in the factum where nephew represented document to be a will rather than a deed, emphasizing the “confidential relationship” between the two).