5 A.3d 1231

**Benedict KARGBO**

v.

**Douglas GASTON.**

**No. 2024, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Sept. 30, 2010.

James R. Hammerschmidt (Patricia M. Weaver, Tracey L. Perrick Paley, Rothman, Goldstein, Rosenburg, Eig & Cooper, Chtd., on the brief) Bethesda, MD, for appellant.

William H. Thrush, Jr. (Rosemary E. Allulis, Weinstock, Friedman & Friedman, on the brief) Baltimore, MD, for appellee.

Panel: EYLER, JAMES R., KEHOE, FREDERICK J. SHARER (Retired, Specially Assigned), JJ.

KEHOE, J.

In 2005, the General Assembly enacted, as emergency legislation, The Protection of Homeowners in Foreclosure Act ("PHIFA" or the "Act"), codified as Maryland Code (1974, 2003, Supp.2006) Real Property Article ("RP") §§ 7–301 through 7–325.[1] The Governor signed the bill into law on May 26, 2005, and the Act took effect immediately. On that day, Douglas Gaston, appellee, was in the midst of completing what Benedict Kargbo, appellant, characterizes as a "classic foreclosure rescue scam," with Kargbo as the victim. The parties' dispute resulted in litigation and, eventually, the Circuit Court for Prince George's County entered judgment in favor of Gaston and against Kargbo. Kargbo has appealed.

The case presents three issues. A preliminary issue is whether the Act, if applied to the transaction between Kargbo and Gaston, deprives Gaston of vested rights. We hold that it does not. The most important issue is whether the trial court erred in determining that Gaston was exempt from the Act. Our review of the record and the applicable law leads us to conclude that the trial court erred. We will, accordingly, vacate the judgment in Gaston's favor and remand this case for a new trial. The third issue is whether the trial court abused its discretion by barring the testimony of a witness who was not disclosed until the day of trial. Our disposition of the first two issues makes it unnecessary for us to discuss the third in any detail.

---

1. The statute has been recodified since the transactions at issue occurred. *See* Maryland Code (1974, 2010) Real Property Article § 7–301 through 7–325 *et seq.* Unless otherwise noted, all references to the Act will be to the version in effect at the time of the transactions between the parties that gave rise to this litigation.

FACTUAL AND PROCEDURAL BACKGROUND

At some point in 2002, Kargbo, a correctional treatment specialist with a Ph.D. from LaSalle University, purchased a residence, located at 6202 Heston Terrace, Lanham, MD 20706. The property was subject to a purchase money mortgage.[2] Later that same year, Kargbo lost his job, at which point he fell behind on his mortgage payments. Kargbo's lender initiated foreclosure proceedings in the Circuit Court for Prince George's County on July 29, 2002.

In order to avoid losing his home, Kargbo filed a bankruptcy petition pursuant to Title 13 of the United States Code on October 25, 2004. The bankruptcy proceedings imposed an automatic stay upon the foreclosure proceedings. Under a plan approved by the Bankruptcy Court, Kargbo was required to make monthly payments in the amount of $4,334 to the mortgagee. However, Kargbo again fell behind on his payments.

Sometime in the spring of 2005, Kargbo was introduced to Gaston through Kargbo's pastor, the Reverend Ellis Venable. Kargbo later testified that Reverend Venable introduced Gaston to him as "somebody who will help you with your mortgage." During that same time frame, Kargbo started a new job as a treatment coordinator with the Prince George's County Department of Corrections. Gaston met with Kargbo to discuss his financial woes and, in particular, Kargbo's desire to save his house from foreclosure. The parties disagree as to the substance of these discussions.

Kargbo testified that Gaston promised that, if Kargbo dismissed the bankruptcy proceeding, he would "bring [Kargbo's] credit back," and pay off his outstanding debts. According to Kargbo, Gaston also stated that he would purchase Kargbo's home for $650,000, rent it to Kargbo for $2,000 a month, and permit Kargbo to repurchase it.

---

2. The original amount of the purchase money mortgage is not disclosed in the record.

Gaston denied stating to Kargbo that he would assist Kargbo with his credit or pay off all of his debts. Instead, he testified that his relationship with Kargbo was that of an investor interested in purchasing a property and that he never offered any advice or assistance to Kargbo regarding any other matter.

As a result of these discussions, the parties entered into a written agreement dated April 20, 2005, whereby Gaston agreed to purchase Kargbo's residence for $650,000. The April contract contained the following provision:

> This contract is subject to a lease agreement to be prepared. If the agreement is not satisfactory to either party, this contract shall be null and void.[3]

After the agreement was signed, Kargbo moved to dismiss his bankruptcy proceeding, an action taken, he claims, at Gaston's behest. The bankruptcy proceeding was dismissed on May 10, 2005.

The parties entered into another contract of sale dated May 12, 2005. The May contract again specified a purchase price of $650,000. It contained a recital that Kargbo acknowledged that the contract was for the sale of his house and was not a loan. However, the contract made no reference either to Kargbo's leasing the property after settlement or Kargbo's having an option to repurchase the property.

The parties settled on the property on June 10, 2005. At closing, Kargbo also signed a series of additional documents:

> —a "Single Family Dwelling Lease," under the terms of which Kargbo would lease his residence from Gaston at a monthly rental rate of $4,000 for a term of eighteen months;

---

**3.** The April contract did not comply with several aspects of Maryland's laws regarding contracts for the sale of single family residences. For example, the April contract failed to contain a provision regarding the allocation of transfer taxes, *see* RP § 14–104, a single family home disclosure and disclaimer statement, *see* RP § 10–702, or a notice pursuant to the Maryland Homeowners Association Act, RP § 11B–106. These deficiencies were corrected in the parties' subsequent contract.

—an "Option to Purchase Real Estate," by which Kargbo, in consideration of his payment to Gaston of $77,185.12, received an option to repurchase the residence from Gaston for a period of eighteen months; and

—a "Memorandum of Terms of Option to Purchase Real Estate," which set out the terms of the purchase in the event that Kargbo exercised his option. The most important term for our purposes is that the purchase price was $650,000.

In addition, Kargbo was presented with various documents intended to comply with certain provisions of the Act. We will discuss these documents in Part II of this opinion. After payment of his first and second mortgages and his share of settlement expenses, Kargbo received $77,425.12, representing his equity in the property, nearly all of which was paid to Gaston for the option.

In May, 2007, Kargbo became delinquent in his rent payments. Gaston filed a "Complaint and Summons Against Tenant Holding Over" in the District Court for Prince George's County on August 20, 2007. Kargbo prayed a jury trial, transferring the case to the Circuit Court for Prince George's County. Thereafter, Kargbo filed a counter-complaint alleging violations of the Act. The demand for jury trial was subsequently withdrawn by Kargbo and the parties proceeded with a bench trial on June 12, 2008.

During the trial, Kargbo attempted to call Reverend Venable as a witness. Kargbo had not disclosed Reverend Venable as a possible witness in discovery. Upon objection by Gaston, the trial court excluded Reverend Venable as a witness.

At the conclusion of the trial, the court took the case under advisement and issued a memorandum opinion on September 22, 2008. The trial court entered judgment in favor of Gaston in the amount of $65,100 for unpaid rent. The court concluded that the effective date of the Act was:

October 1, 2005. Therefore because the sale transaction involved in this case took place between April 2005 and June

2005 pursuant to the evidence, PHIFA does not apply, nor do its requirements, . . . .

[T]he sale of the real property in dispute in this case from Mr. Kargbo to Mr. Gaston was valid without any fraud or misrepresentation. The court further finds that all contracts entered into between the parties are valid and enforceable. In addition, the settlement process that took place on June 10, 2005 transferring title of the real property from Mr. Kargbo to Mr. Gaston was in compliance with the law . . . .

\* \* \*

[B]ased on the above findings of facts and lack of evidence presented at trial to support the claims, judgment is entered in favor of counter-defendant Douglas Gaston and against Counter-plaintiff Benedict Kargbo as to all counts of the Counter Complaint. . . .

Kargbo filed a motion to alter, amend, set aside or revise judgment, based, in part, on the assertion that the trial court erred in determining the effective date of the Act. After considering Kargbo's motion, the trial court concluded that the effective date of the Act was May 26, 2005. However, the trial court construed § 7–302 of the Act as excluding Gaston from its coverage in this case. We will discuss the trial court's analysis in Part II hereof.

In addition, the trial court made alternative findings of fact to support its decision:

The court further finds based on the evidence presented at trial that Mr. Kargbo initiated contact between the parties through his pastor Ellis Venable and that Mr. Gaston did not solicit or contact Mr. Kargbo on his own.

Also, while a foreclosure action was filed in the Circuit Court for Prince George's County, Maryland (CAE02–18938) against Mr. Kargbo it was subsequently dismissed for lack of prosecution under *Maryland Rule* 2–507 by Judge Toni Clarke on February 24, 2006. *Rule* 2–507(c) permits the court to dismiss a case for lack of prosecution one year from the date of the last docket entry in the case.

Therefore, it can be reasonably inferred that at the time of the transaction between the parties the foreclosure case was not actively being prosecuted. In addition, the evidence showed that Mr. Kargbo filed a Chapter 13 bankruptcy and was in a repayment plan at the time of the transaction. This resulted in a stay as to the foreclosure which was not lifted by the Bankruptcy Court.

Finally, this court finds that Mr. Kargbo was a sophisticated and educated person, holding a Ph.D. from La Salle University, and understood the nature of the transaction between the parties. A face-to-face settlement occurred in the case handled by Scott Speier, Esquire and the testimony at trial showed that all efforts were made to comply with the recently enacted PHIFA statute.

Therefore, based on the findings of this court the judgments ordered on September 5, 2008 are to remain in full force and effect and will not be altered, amended, set aside or revised.

Kargbo filed a timely notice of appeal and presents several issues, which we have consolidated and reworded:

I. Does application of PHIFA to the parties' transaction deprive Gaston of vested rights?

II. Did the trial court err in concluding that the Act was inapplicable to the transaction?

III. Did the trial court abuse its discretion in excluding the testimony of a witness who was not disclosed to Gaston until the day of trial?

We will discuss additional facts as necessary in the opinion.

## DISCUSSION

While a trial court's interpretation and application of statutes is reviewed *de novo,* its factual findings will not be overturned unless clearly erroneous. *Nesbit v. Gov't Employees Ins. Co.,* 382 Md. 65, 72, 854 A.2d 879 (2004). Under the clearly erroneous standard, a trial court's findings will not be overturned if there exists "any competent material evidence to support the factual findings of the court." *YIVO Inst. for*

*Jewish Research v. Zaleski,* 386 Md. 654, 663, 874 A.2d 411 (2005) (citing *Solomon v. Solomon,* 383 Md. 176, 202, 857 A.2d 1109 (2004)). In addition, we can affirm a trial court's decision on any ground clearly demonstrated by the record even if the trial court did not rely upon it. *YIVO Institute,* 386 Md. at 663, 874 A.2d 411.

Before turning to the parties' specific contentions, we will summarize the Act and the social problem it attempts to address.

In *Johnson v. Wheeler,* 492 F.Supp.2d 492, 495–96 (D.Md. 2007), Judge Messitte explained:

> Typically, a homeowner facing foreclosure is identified by a rescuer through foreclosure notices published in the newspapers or at government offices. The rescuer contacts the homeowner by phone, personal visit, card or flyer, and offers to stop the foreclosure by promising a fresh start through a variety of devices. As the date for the foreclosure approaches and the urgency of the matter becomes greater, the rescuer or some entity with which he is linked agrees to arrange for the pay-off of the mortgage indebtedness and to see to the transfer of title to the property to an investor prearranged by the rescuer, often with a leaseback of the property to the homeowner for a period of time, occasionally giving him the right to repurchase the property after the lease ends. The rescuer imposes heavy fees or other charges for his services, in effect stripping some if not all of the homeowner's equity, and does all this with little or no advance notice to the homeowner, who is usually unrepresented by counsel.

Writing for this Court, Judge James Eyler summarized the Act in *Julian v. Buonassissi,* 183 Md.App. 678, 683–87, 963 A.2d 234 (2009), *vacated on other grounds,* 414 Md. 641, 997 A.2d 104 (2010), and we quote from Judge Eyler's analysis at length:

> As explained in the Preamble to the Bill that was enacted as PHIFA,

In response to foreclosure abuses, in 2005, the legislature enacted PHIFA. As stated in the preamble to Senate Bill 761, in pertinent part, the legislation was for the purpose of specifying the form and contents of certain contracts and documents; providing that a homeowner has the right to rescind certain contracts and transactions within a certain time; ... prohibiting foreclosure consultants and foreclosure purchasers from engaging in certain practices; ... prohibiting certain documents from being recorded within a certain period; ... and exempting certain persons from certain provisions of this Act....

Preamble, Laws of 2005, ch. 509.

In pertinent part, the statute provides as follows. A foreclosure consultant [] must provide a foreclosure consulting contract [] to the homeowner [] for review which must disclose the services to be provided and the compensation to be received by the consultant or others working with the consultant, and advise the homeowner of rescission rights granted by the statute. RP § 7–306. A homeowner has the right to rescind a foreclosure consulting contract at any time and rescind a foreclosure reconveyance [] at any time within 3 business days after the date the homeowner signed the document of sale. RP § 7–305....

If a foreclosure reconveyance is involved, the foreclosure purchaser [] [4] shall provide the homeowner with a document which, *inter alia,* describes the terms of any foreclosure conveyance, any related agreement allowing the homeowner to remain on the property or to repurchase, and the homeowner's right of rescission. RP § 7–310. The time for rescission does not begin to run until the foreclosure purchaser has complied with the requirements. RP § 7–310(e).

---

**4.** We will discuss the statutory meaning of "foreclosure consultant," "foreclosure purchaser," and "foreclosure reconveyance" in Part II. As we will explain, Gaston's purchase of Kargbo's house was a foreclosure reconveyance and Gaston was, accordingly, a foreclosure purchaser. There was conflicting evidence as to whether Gaston acted as a foreclosure consultant to Kargbo.

During the 3–day rescission period, a deed to the property may not be recorded. RP § 7–310(k).

A foreclosure purchaser may not enter into a foreclosure reconveyance with the homeowner, unless the foreclosure purchaser verifies that the homeowner has a reasonable ability to make lease payments, if there is a leaseback, and a reasonable ability to repurchase the property within the terms of the right to repurchase. RP § 7–311. The foreclosure purchaser is also prohibited from engaging in various other unfair or deceptive practices. RP § 7–311(b)(2)–(5). The foreclosure purchaser may not record any document of title until after the homeowner's right to rescission has expired. RP § 7–311(b)(6).

\* \* \*

The Attorney General may enforce PHIFA by requesting injunctive relief, see RP § 7–319, and a homeowner may bring an action for damages. RP § 7–320. A court may award reasonable attorney's fees, and if the statutory violation was knowing or wilful, may treble the amount of actual damages. *Id.*

PHIFA does not apply to various entities enumerated in RP § 7–302(a), except as provided in subsection (b) [thereof.]

(Footnotes omitted).

## I. Vested Rights

■ The Act became effective on May 26, 2005. While the two contracts were signed by the parties prior to that date, the parties did not actually close on the property until June 10, 2005. Since the conveyance in question here took place after the effective date of the Act, as a general rule, the Act would apply. Gaston, however, argues to the contrary.

He asserts that, as the contract of sale between Kargbo and Gaston was signed before its effective date, the Act is inapplicable to the transaction between the parties. He elaborates:

[A]ccording to the testimony of both parties, they met at some point during the Spring of 2005. At that time, the parties agreed to enter into a contractual agreement where-

by Appellee would purchase Appellant's house and lease it back to Appellant for a period of eighteen months, after which Appellant would have the option of purchasing the house back from Appellee. Although the date that the parties orally agreed to enter into the transaction is not clear, it was some time prior to April 20, 2005. Thereafter, in accordance with their agreement, on April 20, 2005, the parties entered into a written sales contract for the sale and purchase of Appellant's house to Appellee. A second written sales contract was then executed on May 12, 2005. It is at this point that the parties' rights and obligations related to this transaction are locked in, based upon the law existing on that date. . . .

* * *

Although the trial court found that the PHIFA was in effect at the "time of the transaction giving rise to this case," the trial court presumably—and incorrectly—premised its decision on the date of the closing, and not the date of the contract. The critical date for this Court's determination, is not the date of the closing, but is the date that the parties' respective rights and obligations were created, which is the date they entered into the contract. . . .

We find Gaston's argument to be unconvincing.

■ It has long been established in Maryland that legislation cannot be applied retroactively to deprive persons of vested rights, including contract rights, regardless of the policy motivations behind the legislative enactment. *See, e.g. Dua v. Comcast Cable of Maryland, Inc.*, 370 Md. 604, 625, 805 A.2d 1061 (2002); *Langston v. Riffe*, 359 Md. 396, 418, 754 A.2d 389 (2000). As Judge Eldridge explained for the Court of Appeals in *Dua*, the authority for this principle lies in two provisions of Maryland's Constitution, Article 24 of the Declaration of Rights [5] and Article III § 40 of the Maryland Consti-

---

**5.** Article 24 of the Declaration of Rights states:

Due process

tution.[6] *Id.* at 628–29, 805 A.2d 1061. If, as Gaston asserts, "the parties' rights and obligations related to this transaction" were vested as of May 12, 2005, *Dua*, and decisions like it, would support Gaston's contention that application of PHIFA to this case would violate his constitutional rights. Therefore, in determining whether the Act is applicable, we must examine what contract rights Gaston possessed on the date the Act took effect.

Under the May contract, Gaston had a right to purchase Kargbo's home.[7] However, that agreement, which was prepared by Gaston's lawyer, contained an integration clause providing, in pertinent part, that the contract and any addenda "contain the final and entire agreement between the parties and ... they shall [not] be bound by any terms ... oral or written, not herein contained." The May contract made no mention of a lease or an option to purchase. Gaston offers no explanation as to why these terms were omitted from the contract if the parties' rights and obligations were, in fact, "locked in" on May 12, as he asserts.

Moreover, even if the parties had a clear verbal understanding at that time as to the terms of the lease and the option agreement,[8] the Statute of Frauds would bar any attempt by

---

That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

6. Article III, § 40 states:

Eminent domain
The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation.

7. The May contract contained several contingencies, including a financing contingency. It is not clear from the record whether Gaston had notified Kargbo that the contingency had been satisfied or waived by May 26.

8. The actual evidence on this issue was conflicting or non-existent. Kargbo testified that he was told he would rent the property for $2,000

Gaston to enforce those agreements between the parties. RP § 5–103 ("No corporeal estate, leasehold ... in land may be assigned, [or] granted ... unless in writing ...."); *see La Belle Epoque, LLC v. Old Europe Antique Manor,* 406 Md. 194, 214, 958 A.2d 269 (2008); RP § 5–104 ("No action may be brought on any contract for the sale or disposition of ... any interest in ... land ... unless the contract on which the action is brought ... is in writing and signed by the person to be charged...."); *Beall v. Beall,* 291 Md. 224, 228, 434 A.2d 1015 (1981) (an option to purchase must be in writing to be enforceable).

The conveyance to Gaston, the leaseback to Kargbo, and the execution of an option agreement were all integral parts of the parties' understanding as effectuated at closing. Substantial elements of their understanding were not reflected in enforceable contracts as of May 25, 2005. Application of PHIFA to this case, therefore, would not deprive Gaston of vested rights. This conclusion, however, does not end our retroactivity analysis.

The application of a statute to events occurring prior to its effective date can have consequences other than interference with vested rights. A statute can impose a new, or a different, legal significance to actions taken prior to its effective date. In the context of this case, Kargbo asserts that Gaston was a foreclosure consultant, as that term is defined by § 7–301(c) of PHIFA, and seeks to hold Gaston liable for Gaston's alleged failure to comply with provisions of the Act regulating activities of foreclosure consultants. In addition, he claims that Gaston violated the Act by acquiring title to the property, leasing it back to Kargbo and selling Kargbo an option to purchase when he was acting as Kargbo's foreclosure consultant. Does assessing Gaston's conduct prior to PHIFA's effective date to determine his possible civil liability for events occurring after the effective date constitute a retroactive application of the Act?

---

a month (the actual rent was double that), and there was no evidence that the parties agreed to the amount of the option fee until closing.

The Court of Appeals considered this question in *John Deere v. Reliable,* 406 Md. 139, 147–48, 957 A.2d 595 (2008). Although the facts in that case are unlike those in the case before us, the Court identified the appropriate analysis:

> In *Landgraf v. USI Film Products,* 511 U.S. 244, 280 [114 S.Ct. 1483, 128 L.Ed.2d 229] (1994), the Supreme Court defined retroactive application of a statute as one that "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." The Court rejected a bright line rule, noting that "a statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment. . . ." *Landgraf,* 511 U.S. at 269 [114 S.Ct. 1483]. Instead, the Court required a "process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Landgraf,* 511 U.S. at 270 [114 S.Ct. 1483]. In the process, the factors to be considered are "fair notice, reasonable reliance, and settled expectations." *Id.* We adopt that analysis.

Neither party addressed this issue before either the circuit court or this Court. As we are remanding this case for a new trial, the parties may wish to do so, particularly in the context of whether Gaston's alleged activities as a foreclosure consultant before the effective date of the Act affect his liability to Kargbo. Application of the " 'fair notice, reasonable reliance, and settled expectations' " test will require some degree of fact-finding. For example, and without limitation, in addition to the fact that the parties had no enforceable agreement as to the totality of their understanding as of the effective date of the Act, the circuit court may wish to consider the degree to which Gaston's alleged activities as a foreclosure consultant occurred before and after the effective date of the Act, when he had notice of the Act's substantive provisions, and the degree to which his conduct was guided by professional advice.

## II. The Trial Court's Decision

The trial court concluded that, while the Act was effective on May 26, 2005, it did not apply to the transaction for two reasons. First, it found that Gaston's activities were not covered by the Act as a matter of law. Second, it made factual findings which, it determined, relieved Gaston of liability. The trial court erred.

### (A) Was Gaston Exempt from the Act?

■■ The first basis of the trial court's decision relies upon the trial court's construction of § 7–302 of the Act. In interpreting a statute, we endeavor to

> ascertain and effectuate legislative intent. We first examine the primary source of legislative intent, the words of the statute, giving them their ordinary and natural meaning. If the meaning of the language is unclear or ambiguous, we must consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment, in our attempt to discern the construction that will best further the legislative objectives or goals.

*Whack v. State,* 338 Md. 665, 672, 659 A.2d 1347 (1995) (internal quotation marks and citations omitted).

Section 7–301 of the Act contains definitions that are pertinent to our analysis. Section 7–301(b) defines a "foreclosure consultant" as a person who:

> (1) Solicits or contacts a homeowner in writing, in person, or through any electronic or telecommunications medium and directly or indirectly makes a representation or offer to perform any service that the person represents will:
>
> \* \* \*
>
> (viii) Save the homeowner's residence from foreclosure;
>
> \* \* \*
>
> (x) Arrange for the homeowner to become a lessee or renter entitled to continue to reside in the homeowner's residence;

(xi) Arrange for the homeowner to have an option to repurchase the homeowner's residence . . . . .

Section 7–301(f) of the Act defines a "foreclosure reconveyance" to mean a transaction involving:

(1) The transfer of title to real property by a homeowner during or incident to a proposed foreclosure proceeding . . . ; and

(2) The subsequent conveyance, or promise of a subsequent conveyance, of an interest back to the homeowner by the acquirer or a person acting in participation with the acquirer that allows the homeowner to possess the real property following the completion of the foreclosure proceeding, including . . . [an] option to purchase, [a] lease, or other contractual arrangement.

Section § 7–301(e) of the Act defines "foreclosure purchaser" as "a person who acquires title or possession of a deed or other document to a residence in foreclosure as a result of a foreclosure reconveyance."

The undisputed facts demonstrate that the transfer was a foreclosure reconveyance as it occurred while a foreclosure proceeding was pending against Kargbo's residence. The transaction also involved a conveyance back to Kargbo of a lease and an option to purchase. Thus, unless otherwise exempted from the Act, Gaston indisputably was a foreclosure purchaser.[9]

The trial court concluded that the Act did not apply to Gaston. It stated:

In applying the statute to the evidence presented at trial the court finds that pursuant to § 7–302 of the PHIFA statute, as enacted in May 2005, the subtitle is not applicable to this case. In 2005, § 7–302 of the subtitle read:

---

9. There was also evidence, including an affidavit signed by Gaston at closing, that he acted as a foreclosure consultant. However, Gaston disputes this characterization, and the circuit court made no findings as to the matter. We will leave the resolution of the issue to the circuit court upon remand.

§ 7–302 Applicability of subtitle

(a) To whom it does not apply.—Except as provided in subsection (b) of this section, this subtitle does not apply to:

(1) An individual admitted to practice law in the State, while performing any activity related to the individual's regular practice of law in the State;

(2) A person who holds or is owed an obligation secured by a lien on any residence in foreclosure while the person performs services in connection with the obligation or lien, if the obligation or lien did not arise as a result of a foreclosure reconveyance;

(3)(i) A person doing business under any law of this State or the United States regulating banks, [ . . . ] while the person performs services as a part of the person's normal business activities; and

(ii) Any subsidiary, affiliate, or agent of a person described in item (i) of this item [ . . . ];

(4) A judgment creditor of the homeowner, if the judgment creditor's claim accrued before the written notice of foreclosure sale required under § 7–105(b) of this title is sent;

(5) A title insurer authorized to conduct business in the State, while performing title insurance and settlement services;

(6) A title insurance producer licensed in the State, while performing services in accordant with the person's license;

(7) A person licensed as a mortgage broker or mortgage lender [ . . . ] while acting under the authority of that license;

(8) A person licensed as a real estate broker, associate real estate broker, or real estate salesperson [ . . . ], while the person engages in any activity for which the person is licensed [ . . . ] so long as any conveyance or transfer of deed, title or establishment of equitable interest is done

through a settlement as defined in § 7–311(a)(5) of this subtitle; or

(9) A nonprofit organization that solely offers counseling or advice to homeowners in foreclosure or loan default, if the organization is not directly or indirectly related to and does not contract for services with for-profit lenders or foreclosure purchasers.

(b) To whom it does apply.—This subtitle does apply to an individual who:

(1) Is functioning in a position listed under subsection (a) of this section; and

(2) Is engaging in activities or providing services designed or intended to transfer title to a residence in foreclosure directly or indirectly to that individual, or an agent or affiliate of that individual.

*The court does not find, based on the evidence presented at trial that Mr. Gaston falls into any of the categories listed in § 7–302(a); therefore under § 7–302(b) the statute is not applicable.*

(Emphasis added.)

The Act applies to, and regulates the activities of, foreclosure consultants and foreclosure purchasers as those terms are defined in § 7–301. Section 7–302(a) creates exemptions by providing that the Act does not apply to various categories of professionals who provide services which, even though sometimes rendered with regard to properties facing foreclosure, are not necessarily associated with the predatory practices the Act addresses. Section 7–302(b) carves out an exception to § 7–302(a), making it clear that the legislature intended the Act to regulate the activities of the classes of persons described in § 7–302(a) when they themselves are involved in acquiring a residence subject to a foreclosure proceeding. In other words, § 7–301 describes to whom the Act applies; § 7–302(a) sets out nine exceptions to the Act's application and § 7–302(b) sets out exceptions to the exceptions.

The trial court's finding that Gaston, who by profession is a computer programmer, did not fall into any of the categories described in § 7–302(a) means that the Act applies to him, not that it does not.

### (B) The Trial Court's Alternate Findings

As an alternate basis for its decisions, the trial court relied upon specific factual findings. The first is that:

> Mr. Kargbo initiated contact between the parties through his pastor Ellis Venable and that Mr. Gaston did not solicit or contact Mr. Kargbo on his own.

At trial, Kargbo testified that Reverend Venable, his pastor, introduced him to Gaston. He stated that, when he began having problems paying his mortgage on time, he contacted Reverend Venable and discussed his mortgage problems. Some time later, Venable called Kargbo and informed him that he had "found out somebody who will help [Kargbo] with [his] mortgage." It is clear that Gaston did not initiate contact. However, this fact is not determinative.

Section 7–301(b) defines a "foreclosure consultant" as a person who "solicits or contacts a homeowner" facing foreclosure and offers assistance in either avoiding foreclosure or making arrangements for the homeowner to remain in the property after foreclosure. The trial court concluded that since Kargbo, through Reverend Ellis, first contacted Gaston, he was not a foreclosure consultant. The United States District Court for the District of Maryland rejected the "initiation of contact" argument in *Johnson*, 492 F.Supp.2d at 506. Judge Messitte explained:

> The Court, moreover, does not read the Act to mean that "mortgage foreclosure consultants" only include persons who happen to initiate contact with homeowners. By that narrow reading, a *de facto* mortgage foreclosure consultant could engage in the most piratical practices targeted by the law and avoid liability simply because the homeowner made the first contact with the de facto foreclosure consultant and was not otherwise solicited or contacted in the first instance

by the de facto consultant. Section 7–301(b) can and must be read more expansively. It defines a foreclosure consultant as one who "solicits or contacts" a homeowner . . . and directly or indirectly makes representation or offer to perform any service that will stop, enjoy, delay, void, etc. the foreclosure sale. "Solicit" may mean "to seek to influence or incite to action," . . . which unquestionably connotes that the initial action has to be taken by the party doing the soliciting. But, in contrast, "contact" has a broader connotation, i.e. while it may well suggest an initial communication that proceeds from one person to the other, it also suggests interaction during subsequent communications, i.e. "contacts" after the parties have first entered into communication with one another To interpret the words "solicit" and "contact" as having identical meaning in the statute, as [the defendants] would have it, is implausible. Each word in a statute should be read to have its own meaning, and an identity of meaning of two or more words is not likely what the Legislature intended.

492 F.Supp.2d at 506 (citations omitted.)

We adopt the construction of § 7–301(b) proposed by the District Court in *Johnson*. Thus, we hold that, although Gaston may not have initiated the contact between the parties, he did have contact with Kargbo and, having arranged for Kargbo to lease his home and have an option to repurchase his home, Gaston falls under the definition of a foreclosure purchaser and, perhaps, of a foreclosure consultant as well. *See* n. 9, *supra.*

 The trial court's second finding was that there was no foreclosure proceeding pending against Kargbo's home when it was sold to Gaston. The trial court erred in so finding.

The Act regulates the activities of "foreclosure consultants" and "foreclosure purchasers" when they perform services pertaining to, or they purchase, as the case may be, a "residence in foreclosure." A "residence in foreclosure" is defined as "residential real property . . . which is occupied by the owner . . . as the owner's principal place of residence, and against

which an order to docket or a petition to foreclose has been filed." RP § 7–301(j). The definition of "residence in foreclosure" makes no mention of bankruptcy (in this case Kargbo had dismissed his bankruptcy proceeding) and the parties do not contest the fact that, at the time the property was transferred to Gaston, there was a foreclosure proceeding pending against the property.

The trial court also found that "Mr. Kargbo was a sophisticated and educated person, holding a Ph.D. from La Salle University, and understood the nature of the transaction between the parties." However, the Act does not indicate that the level of sophistication and education of a homeowner is a factor to be considered in assessing a foreclosure consultant's or a foreclosure purchaser's compliance with the Act.

The trial court's final finding is that:

A face-to-face settlement occurred in the case handled by Scott Speier, Esquire and the testimony at trial showed that all efforts were made to comply with the recently enacted PHIFA statute.

The evidence indicates that, at closing, Gaston's lawyer presented Kargbo with a "Notice of Recission," a "Notice of Right to Cancel Transfer of Deed or Title," "Notice of Transfer of Deed or Title," and "Notice Required by Maryland Law, Maryland Code, Real Property Section § 7–306(a)(5)." These documents were intended to comply with § 7–310 of the Act, which mandates such notices. However, the obligations imposed by the Act extend beyond providing notices and rights of recission. Section 7–307(5) prohibits a foreclosure consultant from acquiring an interest "in a residence in foreclosure from a homeowner with whom the foreclosure consultant has contracted[.]"

Section 7–311(b)(1)(i) prohibits a foreclosure purchaser from entering into a foreclosure reconveyance unless the foreclosure purchaser "verifies and can demonstrate that the homeowner has or will have a reasonable ability to make the lease payments and repurchase the property within the term of the option of purchase." Section 7–311(b)(3) prohibits a foreclo-

sure purchaser from entering into a repurchase or lease agreement containing terms that are commercially unreasonable or unfair.

Because the trial court concluded that Gaston was exempt from the Act, it made no findings as to Gaston's compliance, or lack of compliance, with the Act's provisions. In addition, the trial court did not determine whether Gaston acted as a foreclosure consultant, as Kargbo alleges. Accordingly, we vacate the trial court's judgment and remand this case for a new trial.

### III. The exclusion of Reverend Venable as a witness.

As we indicated, Kargbo attempted to call Reverend Venable as a witness. Gaston objected, on the basis that Reverend Venable had not been specifically identified as a witness in Kargbo's responses to interrogatories. As we are remanding the case for a new trial, Kargbo will have an opportunity to give timely notice to Gaston and we need not address the merits of this issue other than to note that, under the circumstances of this case, the trial court did not abuse its wide discretion " 'in applying sanctions for failure to comply with the rules relating to discovery.' " *Heineman v. Bright,* 124 Md.App. 1, 7, 720 A.2d 1182 (1998) (quoting *Tydings v. Allied Painting & Dec. Co.,* 13 Md.App. 433, 436, 283 A.2d 635 (1971)).

**THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IS VACATED AND THE CASE IS REMANDED FOR A NEW TRIAL IN ACCORDANCE WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**